UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANIEL ROUSTER,

                Plaintiff,

                                              Case No. 11-10986

v.                                         Honorable Thomas L. Ludington

COUNTY OF SAGINAW et al,

                Defendants.

_____ /

**OPINION AND ORDER GRANTING DEFENDANT CONLEY'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANTS SECURE CARE, MARRS AND MENCHACA'S MOTION FOR SUMMARY JUDGMENT**

       Since 1791, the Constitution has expressly prohibited "cruel and unusual punishments." U.S. Const. amend. VIII.   The Supreme Court decided in 1976 that this prohibition includes a proscription against deliberate indifference to a prisoner's serious medical needs.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

       For a plaintiff to establish a deliberate indifference claim, however, he must show not only need but knowledge: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

       Here, the evidence that that the plaintiff has marshaled in support of his claim does not make the required showing.   The defendants are entitled to summary judgment.

**I**

**A**

       Plaintiff Daniel Rouster, personal representative of the estate of his late brother, Jerry Rouster ("Mr. Rouster"), filed suit in this Court in March 2011 against eleven defendants.

The first five were the County of Saginaw and four of its police officers, Alvin Rimer, Michael VanHorn, Shontell O'Neal-Johnson, and Victor Gomez. In 2011, Plaintiff and these five defendants reached a settlement. For $1.3 million, Plaintiff would dismiss the claims against them. The Court approved the settlement in June 2012. ECF No. 72.

The next two defendants were a doctor, Joseph Natole, Jr., MD, and his firm, Joseph Natole, Jr., MD, PC. In June 2012, the Court entered a stipulated order dismissing the claims against these two defendants as well. ECF No. 73.

And then there were four. They are Secure Care, Inc., and three of its former employees: Cathleen Conley, RMA; Debra Marrs, LPN; and Stella Menchaca, LPN.

**1**

Secure Care is a corporation that specializes in providing healthcare services to inmates of jails, prisons, and other correctional institutions.

Its operations at the Saginaw County Jail were overseen by a registered nurse, Elaine Kaiser. *See* Kaiser Dep. 6, Nov. 14, 2012, *attached as* Secure Care's Mot. Summ. J. Ex. C. (Secure Care's contract to provide these services ended in 2009.) Ms. Kaiser was present at the jail during regular business hours and available any time by phone. *See* Kaiser Dep. 8.

A doctor came to the jail twice a week; he was also available by phone at any time. In 2007, that doctor was Dr. Natole.

And 24 hours a day, seven days a week, Secure Care staffed the jail with two "healthcare professionals" — either registered medical assistants ("RMAs") or licensed practical nurses ("LPNs"). *See* Kaiser Dep. 16 ("There was no requirement for any particular type of healthcare professional.").

**2**

Ms. Conley is an RMA.  Conley Dep. 14, Oct. 23, 2012, *attached as* Conley Mot. for Summ. J. Ex. B.  In 2001 or 2002 (she does not recall precisely when), Ms. Conley began working as a medical assistant for Secure Care at the Saginaw County Jail.  Conley Dep. 25–26.  She worked the night shift: 6 pm to 6 am.  Conley Dep. 26.

**3**

Ms. Marrs is an LPN.  *See* Marrs Dep. 11–12, Mar. 13, 2012, *attached as* Conley Mot. Ex. C.  She began working for Secure Care in 2005.  Marrs Dep. 24.  Initially, she worked for Secure Care in the Bay County Jail.  Marrs Dep. 31.  In mid-2005, she began working part time in the Saginaw County Jail as well.  Marrs Dep. 31.  And by May 2007, Ms. Marrs divided her time between the jails of Bay, Saginaw, and Tuscola counties.  Marrs Dep. 33.  She worked the day shift: 6 am to 6 pm.

**4**

Ms. Menchaca is also an LPN.  Menchaca Dep. 10, Mar. 23, 2012, *attached as* Secure Care Mot. Ex. L.  She began working for Secure Care in 1997.  Menchaca Dep. 14.  Like Ms. Conley, Ms. Menchaca worked the night shift: 6 pm to 6 am.  Menchaca Dep. 37.

**B**

Mr. Rouster was born in 1959.  The first relevant medical evidence regarding the gentleman, however, comes when he is 47.

In August 2006, Mr. Rouster's girlfriend brought him to the emergency room.  *See* St. Mary's Discharge Summary 1, *attached as* Secure Care's Mot. Ex. G.  The girlfriend reported that Mr. Rouster "was acting very strange.  She said he is an alcoholic . . . and just was not feeling good so she thought maybe he was having stomach flu and brought him to the ER."  *Id.*

Mr. Rouster complained of "abdominal pain, vomiting and black, tarry stools for 1 day." *Id.* After an examination in the ER, Mr. Rouster was admitted and underwent an endoscopy. *Id.* A bleeding duodenal ulcer (a type of peptic ulcer) was found and cauterized. *Id.*

Two days later, he was discharged in stable condition. *Id.* Mr. Rouster's discharge diagnosis was "[a]cute upper gastrointestinal bleeding secondary to bleeding duodenal ulcer status post cauterization" and "[h]istory of alcohol abuse." *Id.*

**C**

Eight months passed. In April 2007, Mr. Rouster was convicted of driving without a license and fined. *See* Saginaw County Intake Form 2, *attached as* Pl.'s Resp. to Conley Mot. Ex. A. Evidently, he did not pay the fine. *Id.* A warrant issued for his arrest, charging him with contempt of court. *Id.*

**D**

On the night of May 7, 2007, Saginaw police officers pulled over a vehicle that did not have a license plate. Mr. Rouster was inside. Because of the outstanding warrant, he was arrested and brought to the Saginaw County Jail. *Id.* He would not survive the stay.

**1**

Arriving at the Saginaw County Jail, Mr. Rouster first encountered Secure Care when one of its employees performed an "intake screening."[1] *See* Intake Screening 1, *attached as* Pl.'s Resp. to Conley Mot. Ex. C.

---

[1] The parties do not agree about the last name of the Secure Care employee who performed the screen. Plaintiff asserts her name is Elizabeth Larson; Ms. Conley asserts that her name is Elizabeth Lewis. Regardless of what her last name is, however, they agree that she is not a defendant in this case.

At the screening, Mr. Rouster reported that he had no medical problems. *Id.* (There is no evidence that he disclosed the bleeding duodenal ulcer that he had the prior August. *See id.*) He also reported that he had one beer that night. *Id.*

The Secure Care employee, however, recorded that Mr. Rouster appeared intoxicated. *Id.* She also recorded that Mr. Rouster was not displaying visible signs of alcohol withdrawal. *Id.*

Since he appeared to present no medical issues, Mr. Rouster was assigned to the jail's general population. He was placed in a cell with 10–20 other inmates.

**2**

The next 40 hours passed uneventfully. Mr. Rouster did not complain of any medical problems, and there is no indication that he manifested any symptoms. During this time, Mr. Rouster appeared before a judge and was sentenced to three days in jail, with credit for time served. *See* Pl.'s Resp. to Conley Mot. 2.

On the night of May 9, however, the calm was broken. Less than 36 hours later, he would be dead.

**3**

Hour one. Secure Care staff received the first report that Mr. Rouster was unwell about 8 pm. Conley Dep. 28. Ms. Conley recalls "I heard from the guards that he had stomach problems." Conley Dep. 32.

Arriving at the cell, Ms. Conley found Mr. Rouster lying on the floor. Conley Dep. 29. When Ms. Conley asked Mr. Rouster his name and to show her his armband, he did not respond. Conley Dep. 31. "He just laid there." Conley Dep. 31. Because Ms. Conley was prohibited from examining an inmate in a crowded cell, she instructed the guards to bring Mr. Rouster to the medical examination room. Conley Dep. 52.

**a**

The medical examination room, Ms. Kaiser explains, is also variously referred to as "the medical department," "the medical office," and "the clinic."  Kaiser Dep. 42.  It allows for closer observation by the medical staff.  *See* Kaiser Dep. 42 (noting that Secure Care staff are permitted to be "in the room with [the patient]").

**b**

Mr. Rouster arrived in the medical examination room about 8:20 pm.  He complained of stomach cramps, abdominal pain, and diarrhea.  *Id*.  He described his pain as "cramping" that was "moderate" to "severe."  *Id*.  He said that the problems had begun a short time ago.  *Id*.  His last bowel movement was that morning, and it was "like $H_2O$."  *Id*.

Ms. Conley asked him about his medical history.  Mr. Rouster denied having any — and he specifically denied having peptic ulcers or abdominal surgery.  *See* Saginaw County Medical Records 4, *attached as* Secure Care Mot. Ex. D.

Ms. Conley's palpitation of Mr. Rouster's abdomen revealed guarding, but no rebound tenderness.  *Id*.  It was not distended.  *Id*.  But, Ms. Conley noted, "All ab muscles flexed and wouldn't unflex."  *Id*.  In her deposition, Ms. Conley recalled that Mr. Rouster "wouldn't let me examine his stomach. . . .  He was fighting me.  He didn't want to be in the room."  Conley Dep. 80.  Plaintiff's counsel asked:

> Q:    And you felt that all of his abdominal muscles were flexed and he wouldn't unflex?
>
> A:    Right.
>
> Q:    So it was your —it was your belief that he was flexing them intentionally?
>
> A:    Yes.
>
> Q:    Okay.

A:      To sit up.

Q:      And it was your belief or understanding that when you felt his abdominal muscles that they were — when you're saying that they were flexed; in other words, tight?

A:      Yes.

Q:      Okay, did you consider that that might, in fact, be his belly in pain?

A:      No.  No.

Q:      Or that it was rebound tenderness?

A:      No.

Q:      Okay.  Didn't consider that?

A:      No, I didn't, because he was fighting me, trying to get up off the table.

Conley Dep. 79–80.  Following the attempted examination, Ms. Conley completed a document entitled "Nursing Assessment for Abdominal Complaints/Pain."  *See* Saginaw County Medical Records 4.  In that document, she recorded that Mr. Rouster was suffering from abdominal pain, gas, and diarrhea.  Saginaw County Medical Records 4.

Giving Mr. Rouster over the counter medication (Tums) for the diarrhea and gas, Ms. Conley advised him to lie on his side and drink fluids.  *Id*.  Ms. Conley did not call Dr. Natole.

Guards returned Mr. Rouster to the cell.  Conley Dep. 94.  About three hours passed.

**4**

Hour 4.  Around midnight, Ms. Conley checked on Mr. Rouster.  Conley Dep. 95.  "I asked him if he still had cramps," Ms. Conley recalled.  Conley Dep. 96.  She remembers: "He did not respond."  Conley Dep. 97.  From this, she concluded that the "cramps resolved themselves."  Saginaw County Medical Records 5.

Half an hour later, however, Ms. Conley again received a report from the guards about Mr. Rouster. Conley Dep. 100. "Inmate now vomiting," her notes reflect. Saginaw County Medical Records 5. Ms. Conley went to the cell. Conley Dep. 100.

When she arrived, Mr. Rouster was no longer vomiting. She asked if he had been using drugs or alcohol. Conley Dep. 100.[2] He denied using either, and so Ms. Conley left without taking any action. Conley Dep. 51.

**5**

Hour 5. At 1 am, Ms. Conley received yet another report about Mr. Rouster from the guards. Conley Dep. 51. "Inmate now eating all leftover food on floor. [Complains of] cramping again," Ms. Conley's notes reflect. Saginaw County Medical Records 5.

Again, Ms. Conley went to the cell to investigate. Conley Dep. 103. By the time she arrived, Mr. Rouster had stopped eating the leftovers. So again Ms. Conley took no action. In her deposition, she explained: "You have to — you have to see it for your own eyes. You can't take the words of other inmates or guards." Conley Dep. 106.

**6**

Hour 6. About 2 am, Ms. Conley received word that Mr. Rouster was drinking from the cell's communal toilet. Conley Dep. 106–07. This time she acted, having Mr. Rouster moved to the medical observation cell. Saginaw County Medical Records 5.

**a**

The medical observation cell, Ms. Kaiser explains, "is a cell that's located on the first floor, main ground floor, of the jail, and [the inmate is] observed in there by a camera that is

---

[2] She did not ask Mr. Rouster about his abdominal pain or cramping (and there is no evidence that he complained of either at this time).

-8-

right at the [correction officer's] desk, and also there's big open windows so that every person

walking by is able to visually see that inmate."  Kaiser Dep.  41.

An inmate would be placed in the medical observation cell, Ms. Kaiser further explained,

"if there was something going on in particular with an inmate that we really wanted to kind of

see what was going on."  Kaiser Dep. 36.  Inquiring into the protocols that governed the use of

the cell, Plaintiff's counsel asked Ms. Kaiser:

> Q:  And who had the authority first of all request that a prisoner patient be moved to the observation area?
>
> A:  Any of my medical staff. . . .
>
> Q:  And then it's their responsibility to keep an eye on the patient?
>
> A:  Whose responsibility?
>
> Q:  Whoever wants them moved to observation. . . .
>
> A:  . . . [No,] certain criteria have to be done by the jail [staff].
>
> Q:  What criteria?
>
> A:  . . . [A] form is actually put on the door, the window, next to that cell, somewhere in the visual sight of all the [correction officers] and they are required to go by there and document what they are viewing that inmate doing.
>
> Q:  Is it on a per-hour basis, is there a time frame set by this procedure?
>
> A:  My understanding with the jail was that it was to be every 15 minutes.
>
> Q:  And when you say every 15 minutes, is that for your medical staff to observe these patients?
>
> A:   No, this was the [correction officers' responsibility.]

Kaiser Dep. 36–38.  Ms. Kaiser elaborated that the correction officers "would have to go in,

observe what the inmate was doing, make a notation at the time of what they saw.  If they for

some reason couldn't see the inmate . . . they would actually have to go in the cell to see what that inmate was doing and make a notation of that."  Kaiser Dep. 38.

Asked about the medical staff's obligations, Ms. Kaiser answered with an illustration, explaining that "if someone was down there for alcohol withdrawal, then we were monitoring that individual between four to six hours and we would go down there and do the monitoring." Kaiser Dep. 38.  (Mr. Rouster himself would be diagnosed with alcohol withdrawal about 12 hours after being placed in the medical observation cell.)

**b**

Ms. Conley, as noted, had Mr. Rouster moved to the medical observation cell about 2 am because she was concerned about his behavior.  In her deposition, Plaintiff's counsel asked her to elaborate on her decision-making process:

> Q:    [I]f 10 to 15 guys are in that [cell] using that toilet for, let's be honest, peeing and — and feces, all sorts of things, the last thing you'd want is someone drinking out of it, wouldn't you?
>
> A:    Yes.
>
> Q:    All right.  So even though you didn't see it, you were concerned enough about that behavior to get him out of there, weren't you?
>
> A:    Right.
>
> Q:    What did you think was going on with [Mr. Rouster]?
>
> A:    Actually, I was assuming that he needed to be moved due to other medical reasons.  I wasn't sure what was going on with him.
>
> Q:    Okay.  But were you concerned about there being a[n] apparently significant change in his mental status?
>
> A:    I was concerned about that yes. . . .
>
> Q:    Did you do another examination at this point, ma'am, before you moved him to see what, if anything, there was different between what was going

-10-

on with [Mr. Rouster] medically now at 2 a.m. versus 8:20 [p.m.] the night before?

A:     No.

Q:     Did you call Dr. Natole at that this time and explain the mental status changes of what was going on?

A:     No, because I wasn't sure there was mental status changes as I didn't see him eating off the floor or drinking out of the toilet.

Q:     Okay.  But apparently those — you were concerned enough to have him moved, right?

A:     Yes.

Q:     But not concerned enough to call Dr. Natole?

A:     I needed proof.  I — you just can't call a doctor with assumptions.

Conley Dep. 108–09.  Ms. Conley does not recall whether she saw Mr. Rouster again before her shift ended at 6 am.  If she did, she made no note of it in her log.  *See* Saginaw County Medical Records 5.

**7**

Hour 10.  At 6 am on the morning of May 10, 2007, Ms. Marrs took over for Ms. Conley.  *See* Conley Dep. 117.  Mr. Rouster was still in the medical observation cell.  *See* Marrs Dep. 72.

Ms. Conley recalls that as the shift changed, "I informed [Ms. Marrs] that I had an inmate that I was observing [who,] per the guards[,] was eating off the floor, per the inmates was drinking out of the toilet, but was not witnessed by me."  Conley Dep. 117; *see* Marrs Dep. 74–75 (acknowledging that Ms. Conley told Ms. Marrs that Mr. Rouster drinking water out of the toilet and eating food off the floor).

Ms. Conley also recalls informing Ms. Marrs that Mr. Rouster had complained of abdominal pain and cramps.  Conley Dep. 117–18.

**8**

Hour 12.  Ms. Marrs first checked on Mr. Rouster a little after 8 am.  Saginaw County Medical Records 7.  She recorded in the log that she saw him stand at the door of the cell and then sit on a cement ledge.  *Id*.  There is no evidence that she inquired into Mr. Rouster's well-being or that he made any complaints to her.

**9**

Hour 16.  At noon, Ms. Marrs again checked on Mr. Rouster, recording that he was walking in the cell.  *Id*.  Again, there is no evidence that she inquired into his well-being or that he made any complaints to her.

**10**

Hour 18.5.  About 2:30 pm, a corrections officer told Ms. Marrs that the officer knew Mr. Rouster and "he drinks a lot."  *Id*.  Ms. Marrs decided to examine Mr. Rouster.  *Id*.

Going into the observation cell, Ms. Marrs checked Mr. Rouster's vitals. Marrs Dep. 109. Asked in her deposition what else she did, Ms. Marrs responded: "Observed what he was doing. Like he was shaking, and asked him questions as far as — I believe I asked him how he was doing." Marrs Dep. 109.  There is no evidence that Mr. Rouster complained of abdominal  pain. See Marrs Dep. 103 ("Q: Did he say anything to you about what was causing him any type of discomfort?  A: No.").  But when Ms. Marrs asked Mr. Rouster the date, he answered "1999." Saginaw County Medical Records 7.

Concerned, Ms. Marrs called Dr. Natole.  Marrs Dep. 105.  Dr. Natole prescribed 50 milligrams of Librium and directed Ms. Marrs to perform a clinical institute withdrawal assessment ("CIWA").  Marrs Dep. 106.  This was the only time Dr. Natole was contacted about

Mr. Rouster's condition.  *See* Natole Dep. 58, May 8, 2012, *attached as* Secure Care Mot. Ex. K.[3]

Ms. Marrs gave Mr. Rouster the dose of Librium.  Saginaw County Medical Records 7. She also administered the CIWA protocol, recording that Mr. Rouster was "speaking quietly, jetting eyes[,[4]] hands [with] tremors, not aware of date."  Saginaw County Medical Records 716. She gave Mr. Rouster a CIWA score of 15.[5]

**11**

Hour 21.  After checking on Mr. Rouster at 5 pm, Ms. Marrs recorded in her notes that that he was "resting behind partition."  Saginaw County Medical Records 7.

A half-hour later, she checked on him again, recording that he "continue[d] to lie on floor behind partition."  *Id.*

This was Ms. Marrs final observation of Mr. Rouster before her shift ended at 6 pm.

**12**

Hour 22.  Ms. Conley came back on shift at 6 pm, joined by Ms. Menchaca.  Ms. Conley recalls that as the shift changed, she was informed by Ms. Marrs that Mr. Rouster had been diagnosed with alcohol withdrawal and prescribed medication.  Conley Dep. 120; *see* Marrs Dep. 132.

---

[3] Dr. Natole has only a dim memory of the conversation, recalling: "I only remember the nurse calling saying we have an inmate who's been incarcerated in the past, he's a known alcoholic, and he's exhibiting symptoms of alcohol withdrawal."  Natole Dep. 34

[4] By "jetting eyes," Ms. Marrs meant "eyes going back and forth quickly."  Marrs Dep. 124.

[5] In general, scores of less than 8 indicate mild risk of withdrawal symptoms.  Scores of 8 to 15 indicate a risk of mild to moderate withdrawal symptoms, for which medication is appropriate.  *See* Natole Dep. 65–66.And scores above 15 indicate a risk of moderate to severe withdrawal, for which hospitalization is appropriate.  *See* Natole Dep. 65–66.

**a**

Ms. Menchaca did not work at the Saginaw County Jail on May 8 or 9, so she did not meet Mr. Rouster until after she began her shift on May 10.  Menchaca Dep. 69.  Inquiring into what she found when she first met the gentleman, Plaintiff's counsel asked:

Q:      [W]hat was your nursing assessment [of Mr. Rouster]?

A:      That he was probably in a state of withdrawal. . . .

Q:      Okay.  Did you consider other things other than withdrawals?

A:      I did consider — I was looking to see if he behaved in a manner that would tell me that he had abdominal complaints.

Q:      So you, specifically, considered abdominal complaints?

A:      I did.

Q:      Why did you consider them?

A:      Because [Ms. Conley] had told me that [Mr. Rouster] had them the first night he came in.

Q:      Do you —

A:      And I was aware of her — her medical sheet that she made up on him.

Q:      The nursing assessment?

A:      Yes, the nursing assessment.

Menchaca Dep. 109–10.  Later in her deposition, however, Ms. Menchaca contradicted herself about what she had been infromed regarding Mr. Rouster's condition.  Plaintiff's counsel asked:

Q:      At any time before my client died, did [Ms. Conley] ever tell you that [Mr. Rouster] was experiencing stomach pain?

A:      No.

Menchaca Dep. 132.

**b**

Hour 23.5.   Around 7:30 pm, Ms. Menchaca examined Mr. Rouster for the first time. Saginaw County Jail Medical Records 5.   "Appears confused," she recorded in her notes, continuing: "Skin cool to touch.   Slight tremor.   Gait unsteady."   *Id*.   Saginaw County Jail Medical Records 5.

Asked to explain in her deposition, Ms. Menchaca testified that "cool to touch" did not mean that his skin felt "abnormal" — merely "[a] little cooler than normal."   Menchaca Dep. 107.   Plaintiff's counsel continued:

> Q:    "Gait unsteady."   What did you see?
>
> A:    He was kind of lopsided in his walk.   He was at the back of the [observation] cell where the commode is when I entered the cell, and he came up to the front.   I called him.   He came to the front, and he was a little unsteady on his feet, so I asked him to sit down.
>
> Q:    When you saw these things, what was your nursing assessment?
>
> A:    That he was probably in a state of withdrawal.
>
> Q:    And what led you to think that?
>
> A:    Because of the tremor, because of his confusion, his gait.

Menchaca Dep. 109.   Ms. Menchaca elaborated: "He was mumbling.   He would obey a command, but he was kind of talking to himself."   Menchaca Dep. 106.   Plaintiff's counsel asked:

> Q:    Did you put your hands on [Mr. Rouster's] abdomen?
>
> A:    No.
>
> Q:    Did you talk to ever talk with him about his abdomen?
>
> A:    I asked him how he was.   How is your stomach feeling[?]
>
> Q:    And what did he tell you?

A:    Denied.

Q:    Denied what?

A:    Denied abdominal pain, denied nausea, denied vomiting.

Q:    Anything else that he told you about his abdomen?

A:    No.  He told me he wanted to go home.

Menchaca Dep. 111–12.  Adminstering a second CIWA, Ms. Menchaca scored Mr. Rouster at a

4.  Saginaw County Medical Records 17.

### 13

Hour 30.  Sometime after midnight, Ms. Conley gave Mr. Rouster his alcohol withdrawal

medication.  Conley Dep. 121–22.

### a

She also administered a third CIWA, scoring Mr. Rouster as a 6.  Saginaw County

Medical Records 18.  Ms. Conley noted on the CIWA form that Mr. Rouster complained of

"stomach pains and states wants to go home."  *Id*.  Inquiring into Ms. Conley's interaction with

Mr. Rouster, Plaintiff's counsel asked:

Q:    Did — was — were you in the cell alone when you did that, gave him the
       meds?

A:    I wasn't in the cell.

Q:    Where were you?

A:    Outside the cell.

Q:    Okay.  Was anybody with you?

A:    I believe I had a CO with me.

Q:    Okay.  Do you remember [Victor] Gomez?

A:     I remember him.

Q:     Do you remember him being with you when this occurred?

A:     I remember somebody there.  I can't say for sure it was him.

Q:     Was [Mr. Rouster] very weak at that time[?]

A:     No.  Actually, he was very strong at that time.

Q:     Was he?  What leads you to say he was so strong?

A:     He was pushing on the door —

Q:     Uh-huh.

A:     — trying to get out.

Q:     Did he appear pale and weak to you?

A:     No.

Conley Dep. 65.

### b

Victor Gomez, formerly a defendant in this case (he was part of the $1.3 million settlement), was a corrections officer on duty that evening.  He recalled Mr. Rouster's physical condition quite differently than Ms. Conley.  *See* Gomez Dep. 99, Mar. 16, 2012, *attached as* Pl.'s Resp. to Conley Mot. Ex. Q.  In his deposition, Mr. Gomez was asked:

Q:     [Mr. Rouster] wanted out?

A:     Yes.

Q:     Do you remember him telling you he wanted medical attention that he wasn't getting?

A:     I think so but I'm not 100 percent sure on that.

Q:     Whether he said exactly that you understood in part that's the message he was trying to convey to you, right?

A:      Yes.

Q:      In part for those bad stomach pains?

A:      Yes.

Q:      I know you characterized — I'll just ask it straight out.  When you saw him, Mr. Gomez, he didn't look very good the whole time he was in that observation cell, did he?

A:      No, he didn't.

Q:      And by not looking very good you mean physically?

A:      Correct.

Q:      Right.  He was looking pretty pale?

A:      Yes.

Q:      He looked sick?

A:      Yes. . . .

Q:      Was it clear that he was in pain?

A:      Sometimes it was.

Q:      What did you see or what did you hear that led you to that[?]

A:      Just him saying his stomach was hurting, he wanted water. . . .

Q:      When you are looking at him there even as of 1:30 it was at least obvious to you from all that you had seen that was going on with [Mr. Rouster that] he needed from your perspective medical attention, didn't he?

A:      Yes.

Gomez Dep. 99, 122–23, 131.  Mr. Gomez also acknowledged that it was his job to check on Mr. Rouster every 15 minutes.  *See* Goldenson Dep. 19, *attached as* Secure Care's Mot. Ex. M.  He acknowledged that he did not do so.  *See id.*  And after Mr. Rouster was found dead, Mr. Gomez

also acknowledged, he forged the log to make it look like he had made the required check-ins. *See* Goldenson Dep. 81.

## 14

When, precisely, Mr. Rouster's final hour came is not clear.  What is clear is that at 5:45 am on May 11, Mses. Conley and Marchaca were called to the observation cell.  Conley Dep. 137–38.  Mr. Rouster, slumped in a corner, was dead.  Saginaw County Medical Records 8–9.

## E

An autopsy was performed by Dr. Kanubhai Virani, M.D.  *See* Pl.'s Resp. to Conley Mot. Ex. R (attaching autopsy).  Dr. Virani concluded that Mr. Rouster "died of peritonitis due to a perforated duodenal ulcer."  *Id*. at 1.  In Dr. Virani's deposition, he was asked:

> Q:    [C]an you tell me, by what mechanism would a perforation of a duodenal ulcer cause this gentleman's death?  What happened?
>
> A:    Well, when perforation happens there is a fluid leaking out of the duodenum into the peritoneal cavity.  And when there is fluid outside of the digestive system, it is going to incite the infection, inflammation, and that causes the peritonitis, which is going to bring down a septic shock and the person dies from that.
>
> Q:    Okay.  And are you able to say, with any reasonable degree of certainty, how many days this would have been?
>
> A:    The appearance of peritonitis is consistent with minimum of one day, maybe three days.

Virani Dep. 15, Aug. 21, 2012, *attached as* Pl.'s Resp. to Conley Mot. Ex. S.

This litigation ensued.

## F

## 1

Plaintiff, as noted, filed suit in this Court in March 2011 against eleven defendants.  In April 2011, Plaintiff filed an amended complaint.  It contains five counts.

Count one, a § 1983 claim against all Defendants, asserts that they violated the Eighth Amendment by being deliberately indifferent to Mr. Rouster's serious medical needs.

Count two, a second § 1983 claim, asserts that the Secure Care was deliberately indifferent by not properly training and supervising its staff.

Count three, a medical malpractice claim against Secure Care and Mses. Conley, Menchaca, and Marrs, asserts that they breached their duty to provide reasonable care commensurate with acceptable medical practice in the community.

Count four, a second medical malpractice claim, asserts that Secure Care breached its duty to provide reasonable care commensurate with acceptable medical practice in the community.

And count five, an ordinary negligence claim against Secure Care and Mses. Menchaca, Marrs, and Conley, asserts that they breached their duty of reasonable care.

**2**

Attached to the amended complaint are affidavits of merit filed by Dr. Joe Goldenson, MD, and Ms. Valerie Tennessen, RN. Am. Comp. Exs. B–C. Both Dr. Goldenson and Ms. Tennessen were deposed by Defendants.

**a**

In Dr. Goldenson's deposition he was critical of several of the defendants, but singled out Ms. Conley's conduct in particular as "pretty egregious." Goldenson Dep. 45. Questioning whether Dr. Goldenson was competent to offer an opinion on the issue, counsel asked:

> Q:    [Y]ou feel qualified to testify as to what a nurse would do under like and similar circumstances, or should do?
>
> A:    I supervise all of the medical staff in the San Francisco County Jail, and I understand what the scope of practice is for those different disciplines. And if someone is practicing outside of that discipline or — you know,

this is a pretty egregious case to me. I don't think it takes a rocket
scientist to say that if someone is lying on the floor, curled up complaining
of pain and someone walks away, that I can't offer an opinion about [that].

Q:      Who walked away?

A:      Ms. Conley.

Q:      So your understanding is that at some point in time Ms. Conley went to a
        jail cell, saw someone laying on the ground in a fetal position and just
        walked away?

A:      She didn't just walk away; she said, "When he gets up," she said "bring
        him into the medical office."

Q:      Where was the office[?]

A:      Across the hall.

Q:      So you did understand from the testimony that she's not allowed to go into
        the cell with multiple inmates in there?

A:      Correct. . . .

Q:      Do you have any information that there was any lapse in time of more than
        a few minutes from the time Mr. Rouster was seen by her behind the bars
        and when she examined him in the medical room?

A:      No, I don't.

Q:      And therefore that would be appropriate, wouldn't it for someone who
        wants to assess a patient to get them out of the cell, get them into a
        medical area where they could be assessed appropriately.

A:      Yes.

Q:      So that would not be egregious behavior, would it?

A:      No.

Goldenson Dep. 45–46, 47–48.  Turning to Dr. Goldenson's contention that Mr. Rouster was

lying in the fetal position, counsel asked:

Q:      There's no tables, chairs, or beds, I don't believe.  There's a large cell;
        several men are in there. . . .  My point is you either stand or you lay on

-21-

the floor. . . .  So it's not so stunning or unusual to be laying on the floor[?]

A:    No, it's not stunning to be laying on the floor, but it is a little concerning that he's in the fetal position complaining of abdominal pain.

Q:    Who says "fetal position"?

A:    I'm sorry, curled up.  I'm editorializing.

Goldenson Dep. 82–83.

Asked what particular actions or omissions of Ms. Conley demonstrate deliberate indifference to a serious medical need, Dr. Goldenson responded: "I think in terms of what she did or didn't do, it was that she didn't contact a registered nurse."  Goldenson Dep. 70.  He elaborated that "it was a complicated situation medically that she had no business making a decision as to whether or not he needed further medical care."  Goldenson Dep. 70.[6]

**b**

Ms. Tennessen, as noted, was also deposed.  Summarizing her conclusions, Ms. Tennessen testified: "They were doing incomplete — providing incomplete care."  Tennessen Dep. 128, Jan. 24, 2013, *attached as* Conley Mot. Ex. D.

---

[6] In contrast, Dr. Goldenson had no criticisms of Dr. Natole's conduct.  In Dr. Goldenson's deposition, counsel asked:

Q:    [Y]ou have no criticisms of Dr. Natole?
A:    I don't know — I didn't have any criticism, because I don't know what they told him, what he asked.  I don't really know any of that. . . .
Q:    [A]s you sit here today, you don't have enough information to say that what Dr. Natole told the medical staff to do was inappropriate; you don't know, do you?
A:    No.
Q:    And therefore, if the medical staff was following what he told them to do, you likewise wouldn't know whether or not they were being deliberately indifferent for following his instructions?
A:    Correct.

Goldenson Dep. 63.

Asked if moving Mr. Rouster to an observation cell was appropriate, Ms. Tennessen answered: "I would have done more than that, but that's one of the steps she should take, yes, to remove him so he could be watched more closely."  Tennessen Dep. 86.

She also acknowledged, however, that she had no reason to believe that Defendants knew Mr. Rouster had a duodenal ulcer.  *E.g.*, Tennessen Dep. 136 ("Q: Do you have any reason to believe that Ms. Conley knew that Mr. Rouster had a bleeding ulcer?  A: No.").

### 3

As noted, four Defendants remain in this case: Secure Care and Mses. Conley, Marrs, and Menchaca.  In February 2013, they moved for summary judgment.  (Specifically, Ms. Conley retained her own counsel and filed a motion for summary judgment.  One day later, Secure Care and Mses. Marrs and Menchaca filed a motion for summary judgment as well.)

### II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

## III

### A

Count one of the amended complaint is a § 1983 claim against all Defendants.  It asserts that they were deliberately indifferent to Mr. Rouster's serious medical needs.

### 1

To prevail on a § 1983 claim, a plaintiff must establish: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009)).

Here, as noted, Plaintiff's § 1983 claim asserts that Defendants were deliberately indifferent to Mr. Rouster's serious medical need, depriving him of his rights under the Eighth Amendment.

### 2

"Excessive bail shall not be required," the Eighth Amendment provides, "nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

The types of "cruel and unusual punishments" that inspired the Framers of the Eighth Amendment were draconian: decapitation, disembowelment, the rack, the intestinal crank, "tortures and other barbarous methods of punishment."  *Gregg v. Georgia*, 428 U.S. 153, 170 (1976) (quotation marks omitted) (citing Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted": The Original Meaning*, 57 Cal. L. Rev. 839, 852–53 (1969)).   The sentence for treason in seventeenth century England is illustrative:

> You are to be drawn upon a hurdle to the place of execution, and there you are to be hanged by the neck, and being alive cut down, and your privy members to be cut off, and your bowels to be taken out of your belly and there burned, you being

-24-

alive; and your head to be cut off, and your body divided into four quarters, and that your head and quarters be disposed of where his majesty shall think fit.

Akhil Amar, *The Bill of Rights* 82 (Yale 1988) (quoting John Baker, *Criminal Courts and Procedure at Common Law 1550–1800* 15, 42 (1979)); *see generally* Granucci, *supra*, at 853–54 (discussing the "Bloody Assize" of 1685 that followed the unsuccessful rebellion of the Duke of Monmouth).[7]

This type of brutal punishment is what the Framers understood the amendment to proscribe.  *See, e.g.*, *Gregg*, 428 U.S. at 170 & n.17 (collecting sources); *see also Hudson v. McMillian*, 503 U.S. 1, 18–20 (1992) (Thomas, J., dissenting); *see generally Furman v. Georgia*, 408 U.S. 238, 316–22 (1972) (Marshall, J., concurring) (discussing history of the Eighth Amendment).

"But," the Supreme Court observes with some understatement, the Court "has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century."  *Gregg*, 428 U.S. at 171.  Instead, it has viewed the Eighth Amendment "less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society."  *Miller v. Alabama*, 132 S. Ct. 2455, 2463 (2012) (quotation marks omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

**3**

One such evolutionary leap came two hundred years after the declaration of independence.  In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court "first applied the Eighth Amendment to a deprivation that was not specifically part of the sentence, but was

---

[7] The phrase itself comes from the English Bill of Rights of 1689.  *See* Granucci, *supra*, at 855.  It was copied verbatim by George Mason in Virginia's Declaration of Rights of 1776.  *See id.* at 840.  "Following its inclusion in the Virginia constitution," a historian notes, "eight other states adopted the clause, the federal government inserted it into the Northwest Ordinance of 1787, and it became the eighth amendment to the United States Constitution in 1791."  *Id.*

suffered during imprisonment.  The Court held that deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment."  Jeffrey D. Bukowski, Comment, *The Eighth Amendment and Original Intent: Applying the Prohibition Against Cruel and Unusual Punishments to Prison Deprivation Cases Is Not Beyond the Bounds of History and Precedent*, 99 Dick. L. Rev. 419, 424–25 (1995).

The Court explained that although the amendment was originally understood to prohibit only "physically barbarous punishments," its text also "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  *Estelle*, 429 U.S. at 102 (quotation marks omitted) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).

Among the "contemporary standards of decency," the Court found, is that prison officials must "provide medical care for those whom it is punishing by incarceration."  *Estelle*, 429 U.S. at 103, 104.  Depriving prisoners of care, the Court observed, "may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."  *Id*. at 103 (citation and quotation marks omitted) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)).

Thus, the Court concluded that the amendment prohibits deliberate indifference to prisoners' serious medical needs.  *Estelle*, 429 U.S. at 104.  But, the Court cautioned that the amendment does not prohibit every deprivation suffered by a prisoner.  The amendment is only offended by deliberate indifference — "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  *Estelle*, 429 U.S. at 105–06 (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 471 (1947) (Frankfurter, J., concurring)).

**4**

Today, a "deliberate indifference" claim "has objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894 (6th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Because the subjective component is dispositive, it is taken up first.

**a**

The subjective component requires just that — subjective awareness that a substantial risk of serious harm exists. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Mere indifference is insufficient. *Id.* The plaintiff must show that the prison official acted with *deliberate* indifference. *Id.*

Negligence is thus insufficient to establish a constitutional violation. *Id.* "When a prison [official] provides treatment," for example, "albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).

Gross negligence (i.e., a prison official not acting "in the face of an unjustifiably high risk of harm that is . . . so obvious that it should be known") is likewise insufficient. *Farmer*, 511 U.S. at 836; *but see id.* at 842 (noting that factfinders may infer that the risk was actually known based on circumstantial evidence and "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Rather, the prison official must have actual knowledge of a medical condition posing a risk of substantial harm: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The burden of establishing this is "onerous." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Breaking it down into its component parts, the Sixth Circuit explains that "a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Jones v*, 625 F.3d at 941.

The reason for the rule is straightforward; it is "the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (emphasis in original); *see also Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir. 1985) (Posner, J.) ("The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century.").

The Sixth Circuit elaborates that, as a policy matter, "[t]he requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citing *Estelle*, 429 U.S. at 106; *Farmer,* 511 U.S. at 835); *cf.* Cass R. Sunstein, *One Case at a Time: Judicial Minimalism on the Supreme* Court (1999) (advocating a judicial approach that resolves the merits with narrow and incompletely theorized rulings).

**b**

Here, Defendants misdiagnosed Mr. Rouster's ailment. They concluded that he was suffering from abdominal pain, gas, diarrhea, and alcohol withdrawal — not a perforated

duodenal ulcer.  They provided treatment for the problems that they thought he had, not for the problem that took his life.

Their misdiagnosis may have been negligent.  Their treatment, ineffective.  But no facts establish that they subjectively knew that Mr. Rouster faced a substantial risk of serious harm and consciously disregarded that risk.

**i**

To recap, the first report that Mr. Rouster was unwell came in around 8 pm on May 9. Ms. Conley recalls "I heard from the guards that he had stomach problems."  Conley Dep. 32. Ms. Conley had Mr. Rouster brought to the examination room, where she asked about his medical history and examined him.  He denied a history of peptic ulcers or abdominal surgery, (although he had been hospitalized with a bleeding peptic ulcer the prior August).  Palpitation of Mr. Rouster's abdomen revealed guarding, but no rebound tenderness.  Ms. Conley concluded that Mr. Rouster was suffering from abdominal cramping, gas, and diarrhea.  She gave him Tums for the diarrhea and gas and told him to lie on his side and drink fluids.

She followed up around midnight.  When Mr. Rouster made no further complaints, Ms. Conley concluded that the cramping, gas, and diarrhea had resolved themselves.

At 12:30 she received a report that Mr. Rouster was vomiting.  Ms. Conley checked on him.  Since he was no longer throwing up, she took no action.

At 1 am, she received a report that he was eating food off the floor.  Again, she checked on him.  Again, he had stopped by the time she arrived.

At 2 am, she received a report that he was drinking out of the toilet.  Concerned, she moved him to the medical observation cell.  Doing so meant that a corrections officer was supposed to check on him every 15 minutes.

At 6 am, Ms. Marrs took over for Ms. Conley.  As they changed shifts, Ms. Conley told Ms. Marrs why she had placed Mr. Rouster in the observation cell and that he had complained of abdominal pain.  Ms. Marrs checked on Mr. Rouster a little after 8 am, again at noon.  There is no evidence that he made any complaints to her on either occasion.

At 2:30 pm, Ms. Marrs learned that Mr. Rouster drank "a lot." Saginaw County Medical Records 7.  Examining him, Ms. Marrs noted his hands were shaking.  Mr. Rouster did not know what year it was.  Concerned, Ms. Marrs called Dr. Natole.  (Again, there is no evidence that Mr. Rouster complained of abdominal pain during Ms. Marrs's examination.)

Dr. Natole prescribed 50 milligrams of Librium and directed Ms. Marrs to perform a CIWA.  Ms. Marrs did so.

At 5 pm, Ms. Marrs checked on Mr. Rouster.  He was resting.  She checked on him again at 5:30.  Again, he was resting.

At 6 pm, Ms. Conley came back to work, joined by Ms. Menchaca.  Ms. Marrs told Mses. Conley and Menchaca that Mr. Rouster had been placed on CIWA protocols for alcohol withdrawal.

An hour and a half later, Ms. Menchaca examined Mr. Rouster and administered a second CIWA.  Like Dr. Natole, she concluded that he was probably in a state of withdrawal.  Asked why she thought so, she explained: "Because of the tremor, because of his confusion, his gait." Menchaca Dep. 109.  She asked Mr. Rouster how his stomach was feeling.  He said it was fine and that he wanted to go home.

Around midnight, Ms. Conley gave Mr. Rouster his medication and administered a third CIWA. She recalls that he did not appear pale or weak — but rather "very strong at that time." Conley Dep. 65.  Mr. Gomez disagrees.  He recalls that Mr. Rouster looked pale, weak, and sick.

Both Ms. Conley and Mr. Gomez agree, however, that Mr. Rouster complained of stomach pain. Dr. Natole was scheduled to come to the jail in several hours; Ms. Conley did not call him.

Ms. Conley may have been negligent in not taking further steps to investigate Mr. Rouster's condition when he complained of stomach pains at 1:30 am. Mr. Gomez testified that at the time he thought Mr. Rouster looked "sick" and should have medical attention (though Mr. Gomez did not attempt to obtain it). Mr. Gomez's knowledge, however, cannot be imputed to Ms. Conley. *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) ("[T]he test for deliberate indifference is a subjective test not an objective test or collective knowledge." (ellipsis omitted)).

Viewing the facts in the light most favorable to Plaintiff, there is no evidence that Ms. Conley actually drew the inference that Mr. Rouster was facing substantial risk of serious harm and then consciously disregarded that risk. Indeed, Plaintiffs own experts acknowledge as much. *See* Goldenson Dep. 70 (quoted above); Tennessen Dep. 136 ("Q: Do you have any reason to believe that Ms. Conley knew that Mr. Rouster had a bleeding ulcer? A: No.").

After administering the medication, Ms. Conley left. It was Mr. Gomez's responsibility to check on Mr. Rouster every 15 minutes from that point on. He acknowledges that he did not do so. At 5:45 am, Mr. Rouster was found dead.

**ii**

Mr. Rouster's death, tragically, may have been preventable. Nothing, however, suggests that it was deliberate.

First, there is no direct evidence that any of the defendants had actual knowledge that Mr. Rouster's stomach pain was symptomatic of a serious medical condition. (Nor, of course, is there any direct evidence that they then consciously disregarded that risk.)

-31-

And the circumstantial evidence does not show that the risk was so obvious that Defendants must have known of the risk.  Plaintiff's most powerful evidence comes from Mr. Gomez, who testified that at 1:30 am Mr. Rouster looked "sick."  Not seriously so.  Not gravely so.  Simply "sick."  Although in some cases a factfinder may infer that the risk of serious harm was actually known from the very fact that the risk was obvious, this is not one of those cases.

Likewise, Mr. Gomez testified that thought Mr. Rouster should have additional medical treatment.  But the undisputed facts show that Defendants provided treatment to Mr. Rouster for the ailments that they thought he had.  Their diagnoses may have been wrong.  Their treatment may have been negligent.

Yet, as noted, "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 105 (quotation marks omitted).  Although Plaintiff may have a tort claim, he does not have a *constitutional* tort claim.  Defendants are entitled to summary judgment on count one of the amended complaint.

**B**

Count two, a second § 1983 claim, asserts that the Secure Care was also deliberately indifferent to Mr. Rouster's medical needs by not properly training and supervising its staff.

**1**

Private corporations like Secure Care that "perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law."  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quotation marks omitted).  The claims are analyzed as though one of municipal liability.  *Id.* at 818 (collecting cases).

To succeed on this type of claim, the Sixth Circuit instructs, a plaintiff must establish two elements. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007)).

First, the plaintiff must show "that his or her constitutional rights were violated." *Id*. And second, the plaintiff must show "that a policy or custom of the [defendant] was the 'moving force' behind the deprivation of the plaintiff's rights." *Id*.

Here, for reasons detailed above, Mr. Rouster's constitutional rights were not violated. Because Plaintiff does not establish the first element of a § 1983 failure to train claim, Secure Care is entitled to summary judgment on count two of the amended complaint.

**2**

Even if Plaintiff had established the first element, the Court notes in passing that Secure Care would still be entitled to summary judgment on this count. To establish this particular type of deliberate indifference claim (i.e., a "failure to train and supervise" claim), "the plaintiff must show prior instances of unconstitutional conduct demonstrating that the employer has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (quotation marks and brackets omitted) (quoting *Miller*, 606 F.3d at 254–55). That is, the failure to train and supervise must be deliberate.

Here, Plaintiff does not identify a history of abuses that would put Secure Care on notice that the training in this particular area was deficient.

Secure Care is entitled to summary judgment on count two of the amended complaint.

**C**

The remaining three counts of the amended complaint are state law claims. The come here based the Court's supplemental jurisdiction.

The United States Code provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(a).

The Sixth Circuit, moreover, instructs that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (citation omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit"). As the Supreme Court explains, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

Here, the state law claims implicate complex questions of Michigan law, such as what standards of care apply to RMAs and LPNs. Comity counsels that Michigan courts decide the novel questions of Michigan law.

**IV**

Accordingly, it is **ORDERED** that Defendant Conley's motion for summary judgment (ECF No. 95) is **GRANTED**.

It is further **ORDERED** that Defendants Secure Care, Marrs, and Menchaca's motion for summary judgment (ECF No. 97) is **GRANTED IN PART**.

It is further **ORDERED** that counts one and two of the amended complaint are

**DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that supplemental jurisdiction over counts three, four, and five

of the amended complaint is **DECLINED**.

<div style="margin-left:40%;">

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

</div>

Dated: April 22, 2013

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 22, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

---